1              IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION

3  _____
                           )
4  PAULITA CORONADO, JURATE KOPECKY, )
  AND ENID LOPEZ, Individually    )
5  and on Behalf of All Others     )
  Similarly Situated,          )
6         Plaintiffs,       )
                           ) CIVIL ACTION NO.
7  VS.                     ) 4:13-CV-2179
                           )
8  D N.W. HOUSTON, INC. D/B/A/     )
  GOLD CUP, W.L. YORK, INC. D/B/A/  )
9  COVER GIRLS HOUSTON, D.        )
  HOUSTON, INC. D/B/A/ TREASURES   )
10  HOUSTON, A.H.D. HOUSTON, INC.   )
  D/B/A/ CENTERFOLDS, ALI DAVARI,  )
11  INDIVIDUALLY AND HASSAN DAVARI,  )
  INDIVIDUALLY,             ) 3:58 P.M.
12        Defendants.       )
  _____)

13

14                  DISCOVERY HEARING
         BEFORE THE HONORABLE LEE H. ROSENTHAL
15                 MARCH 26, 2015

16  APPEARANCES:

17  **FOR PLAINTIFFS:**
  MR. GALVIN B. KENNEDY AND
18  MS. BEATRIZ SOSA-MORRIS
  Kennedy Hodges LLP
19  711 West Alabama
  Houston, Texas   77006
20  (713)523-0001

21  **FOR DEFENDANTS:**
  MR. CASEY T. WALLACE AND
22  MR. BENJAMIN WITTEN ALLEN
  Johnson Trent West and Taylor LLP
23  919 Milam, Suite 1700
  Houston, Texas   77002
24  (713)860-0517

25  Proceedings recorded by mechanical stenography, transcript
  produced by computer.

1    APPEARANCES CONTINUED:

2    **FOR DEFENDANTS:**
     MR. JAMES ALFRED SOUTHERLAND
3    Shellist Lazarz Slobin
     11 Greenway Plaza, Suite 1515
4    Houston, Texas  77046
     (713)621-2277
5
     MS. LAUREN MARGARET SERPER
6    Attorney at Law
     3405 Edloe, Suite 200
7    Houston, Texas  77027
     (713)278-9398
8
     **COURT REPORTER:**
9    Heather Alcaraz, RMR, FCRR
     Official Court Reporter
10   515 Rusk, Room 8004
     Houston, Texas  77002
11   (713)250-5584

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Go ahead and state your appearances,

2     please.

3              MR. KENNEDY:  Good afternoon, Your Honor.  Galvin

4     Kennedy and Beatriz Sosa-Morris for the plaintiffs.

5              THE COURT:  All right.  Thank you.

6              MR. WALLACE:  Good afternoon, Your Honor.  Casey

7     Wallace for the four corporate defendants as well as for the

8     individual defendants, the Davaris, one of whom is with us here

9     today.

10             THE COURT:  All right.  Thank you.

11             MR. ALLEN:  Ben Allen for the defendants.

12             MS. SERPER:  Lauren Serper for the defendants.

13             MR. SOUTHERLAND:  And Alfred Southerland for the

14    defendants, Your Honor.

15             THE COURT:  All right.  Let's first take up the motion

16    to strike the late opt-ins and to supplement the motion to

17    strike.  I think the issue is the motion to strike the opt-ins

18    filed after January 16 up to February 20, which is the date the

19    plaintiffs filed the response brief.

20             The defendants' view of the world is that the

21    plaintiffs' lawyers went on TV and, thereafter, there were more

22    opt-ins filed.  And that occurred on January 16th -- on

23    January 19th, which was after the January 16 deadline.  The

24    defendants -- the plaintiffs' view of the world is that at least

25    for late filers for whom the lateness was entirely based on

1    incorrect address problems, there should be an additional period

2    up until January 20 to permit them to opt-in.

3              Have I accurately summarized the parties' respective

4    positions?

5              MR. SOUTHERLAND:  Generally, Your Honor.  There are

6    some that we don't contest that we can knock out quickly.

7              THE COURT:  Why don't you identify those.

8              MR. SOUTHERLAND:  Those would be Ms. Gallegos --

9              THE COURT:  Gallegos.

10             MR. SOUTHERLAND:  -- and Porter.

11             THE COURT:  Okay.

12             MR. SOUTHERLAND:  We do not contest those.  As a

13   matter of fact, Ms. Gallegos filed hers after we filed our

14   second supplement, so we're not contesting those.

15             THE COURT:  All right.

16             MR. SOUTHERLAND:  Juliana Mata has withdrawn from the

17   case, so there's --

18             THE COURT:  So that's moot.

19             MR. SOUTHERLAND:  There are five of them, Your Honor,

20   who did not file any showing of good cause.

21             THE COURT:  They will not be permitted to be late

22   filers.

23             MR. SOUTHERLAND:  And can I give you --

24             THE COURT:  They have to have some basis.

25             MS. SOSA-MORRIS:  Can we have some time --

1           THE COURT:  No.

2           MS. SOSA-MORRIS:  -- to --

3           THE COURT:  Come on.  You've had plenty of time.

4           MS. SOSA-MORRIS:  Can we have tolling of their statute

5    of limitations?

6           THE COURT:  Yes.

7           MS. SOSA-MORRIS:  Thank you.  For at least 30 days,

8    Your Honor?

9           THE COURT:  Yes.

10          MS. SOSA-MORRIS:  Thank you, Your Honor.

11          MR. SOUTHERLAND:  Would you like me to give you those

12   names, Your Honor?

13          THE COURT:  Yes.

14          MR. SOUTHERLAND:  Russell, Galan, Holguin -- that's

15   H-O-L-G-U-I-N -- Thrash and Murphy.

16          THE COURT:  All right.  Thank you.

17          MS. SOSA-MORRIS:  Your Honor --

18          THE COURT:  Yes.

19          MS. SOSA-MORRIS:  -- with respect to Murphy, she has

20   previously filed her consent form in this cause of action from

21   the first mailing, the one that --

22          THE COURT:  When did she file it?

23          MS. SOSA-MORRIS:  That was within the opt-in period

24   that's not disputed; however, the defendants are making an issue

25   as to she didn't file the consent for Cover Girls or Gold Cup --

1   or, sorry, Cover Girls or Centerfolds and, therefore, she's not

2   asserting claims against those two entities.

3          It's our position -- and we'd like a ruling from this

4   Court -- that any consent filed in this matter is a consent --

5          THE COURT:  But the issue that I don't believe the

6   parties have thoroughly addressed --

7          MR. SOUTHERLAND:  No, we have not, Your Honor.

8          THE COURT:  -- so I'm going to give you a chance to do

9   that.  I'm not going to rule on that now.

10          MS. SOSA-MORRIS:  Okay.

11          THE COURT:  She will remain an open question for that

12   reason.

13          MR. SOUTHERLAND:  All right.

14          THE COURT:  Certainly she is allowed to assert her

15   claims and opt in as to the club she did identify.

16          MR. SOUTHERLAND:  And we do not contest that,

17   Your Honor.

18          THE COURT:  That's fine.

19          MR. SOUTHERLAND:  The issue is that she had filed late

20   an undated, unsigned -- she signed it but did not date the

21   notice.

22          THE COURT:  As to the two additional clubs.

23          MS. SOSA-MORRIS:  So would it be proper for plaintiffs

24   to file a motion to the Court allowing any consent --

25          THE COURT:  Late filing as to the two additional clubs

1    for this one plaintiff.

2            MS. SOSA-MORRIS:  Well, the issue might still be the

3    same for other individuals.

4            THE COURT:  It might be, but let's tee it up as to her

5    and see what the result is.  And surely you guys can extrapolate

6    from that to similarly situated other late filers.

7            MR. SOUTHERLAND:  And on those individuals,

8    Your Honor, I would argue that --

9            THE COURT:  You'll get a chance.

10           MR. SOUTHERLAND:  Thank you.

11           THE COURT:  We're not doing that now.  Okay.

12           MR. SOUTHERLAND:  And then the next category would

13   be --

14           THE COURT:  I want both sides to be able to see the

15   argument.

16           MR. SOUTHERLAND:  Yes, Your Honor.  That's fine.

17           The next category would be eight individuals who filed

18   who -- who either electronically signed their notices of consent

19   or -- actually, two met -- two signed them themselves after the

20   16th.  And so our position on those would be that they did not

21   comply with the Court's order as far as filing it by that

22   deadline.  They all received it in advance.

23           THE COURT:  All right.  Let me hear the response.

24           MS. SOSA-MORRIS:  These are for the individuals who

25   signed after the -- 13 people have provided declarations.  The

1   only people who have not provided declarations are the ones that

2   we just discussed.

3              THE COURT:  Okay.  And of those who provided

4   declarations, did they -- in their declaration, did any of them

5   address reasons for late filing other than problems with the

6   address?

7              MS. SOSA-MORRIS:  It was a combination of -- we have a

8   chart in our -- on a document 149, page --

9              THE COURT:  Give me the page number.

10             MS. SOSA-MORRIS:  Page 6, Your Honor.

11             THE COURT:  All right.  Hold on.  And docket entry

12  number --

13             MS. SOSA-MORRIS:  149.

14             THE COURT:  Okay.

15             MR. SOUTHERLAND:  Your Honor, I have -- I can identify

16  each of those to assist you once that comes in.

17             THE COURT:  Once we have the document, that's fine.

18             MR. SOUTHERLAND:  Because what I tried to do,

19  Your Honor, was segregate out those we don't contest, those with

20  no good cause, those dated after the 16th, and then there are

21  four that either had them electronically dated or signed before

22  the 16th.

23             THE COURT:  Okay.  But my question is as to the people

24  who did file a good-cause showing but identify -- are there any

25  who identified reasons other than incorrect address?

1          I understand you raised -- you have this chart, which

2     I'm getting a copy of.

3          MS. SOSA-MORRIS:  Yes.  One individual lived with her

4     mother.  Her mother confused her mail with her own, and she did

5     not receive it until after the opt-in deadline.  And once she

6     identified the document, contacted us and joined the case.

7     And --

8          THE COURT:  And what's the name of that individual?

9          MS. SOSA-MORRIS:  Give me one second, Your Honor.

10    It's Jacqueline Ackerer.

11         THE COURT:  Why isn't that good cause?

12         MR. SOUTHERLAND:  Okay.  She was one who --

13    Your Honor, who -- who claimed -- let me pull her up here.

14         She's -- she was one who signed it on January 10th,

15    and I think what she said was that -- I -- only -- she says that

16    she -- the addresses were confused with her mother's, and she

17    says once she got it, she contacted them to discuss.

18         And I guess my point, Your Honor, with respect to her,

19    for example -- and she's in that last category -- when their

20    declaration says, for example, "I reached out to contact them to

21    discuss and file it," presumably, since it says clearly it must

22    be received by us by January 16th, why, when she reached out to

23    them, did they not communicate to her that she had -- she had to

24    get it to them by the 16th?

25         MS. SOSA-MORRIS:  If she contacted us and says, "Hey,

1    I'm sorry.  I got -- you know, I got this late," I'm not going

2    to say, "Oh, sorry, I'm not going to represent you."  That's --

3          THE COURT:  I think that's a valid response.  I'm

4    going to allow the late filing as to opt-in plaintiff Ackerer.

5          MS. SOSA-MORRIS:  With regards to this chart, if it

6    has an exhibit number next to -- and the reason for joining

7    untimely is because we provided declarations for these

8    individuals and --

9          THE COURT:  Can you talk into the microphone, please?

10         MS. SOSA-MORRIS:  Yes.

11         THE COURT:  Thank you.

12         MS. SOSA-MORRIS:  On the chart, if it has an exhibit

13   number next to -- in the comment section of the middle column.

14         THE COURT:  I see.  And the reason.

15         MS. SOSA-MORRIS:  It's on the reasons, yes.  It's

16   because there is a declaration associated with that filing

17   regarding the address being different -- either being

18   forwarded -- and we provided this information.

19         THE COURT:  Okay.  My question is, again:  Can you

20   just call out for me the names of the individuals whose

21   good-cause showing declaration identified address problems --

22         MS. SOSA-MORRIS:  Yes.

23         THE COURT:  -- as the reason for the late opt in?

24         MS. SOSA-MORRIS:  Yes.  Kayla Rodgers --

25         THE COURT:  Okay.

1          MS. SOSA-MORRIS:  -- the first one, she lived at a

2    different address to where the consent form was originally

3    mailed.

4          THE COURT:  Got it.

5          MS. SOSA-MORRIS:  Angela Caraces [sic] -- Cazares --

6    Cazares, she --

7          THE COURT:  Got it.

8          MS. SOSA-MORRIS:  -- likewise --

9          THE COURT:  I got it.

10          MS. SOSA-MORRIS:  -- was not -- okay.

11          Chantel Diaz, same issue; Benita Natividad, same

12    issue; Erika Kirkpatrick, same issue; Monica Glass, same issue;

13    Marcy Taylor, same issue; Twana Deshayes, she was out of the

14    country.  It was --

15          THE COURT:  No, that's a different thing.  That's a

16    different point, so --

17          MS. SOSA-MORRIS:  Correct.

18          THE COURT:  So Ms. Daniels [sic] --

19          MS. SOSA-MORRIS:  Samantha Daniel --

20          THE COURT:  -- new address, sent to the wrong address.

21          MS. SOSA-MORRIS:  Correct.

22          Karisha Burke, changed addresses as well.  And Kiana

23    Johnson, it was sent to her mother's address, but she was -- she

24    was not notified.

25          THE COURT:  All right.

1        MS. SOSA-MORRIS:  It was not her address.

2        THE COURT:  I am inclined, as to those individuals who

3   have shown that the address to which the opt-in notice was sent

4   was not their current address, that we should allow the

5   extension of time for them to opt in to -- up to February 20th.

6        MR. SOUTHERLAND:  If I may respond, Your Honor?  And I

7   don't know how to -- two points, I guess.

8        One, with respect to the conveyance of the notice to

9   the potential party plaintiff, as you may recall, with respect

10   to these individuals, whether it be -- and most of these joined

11   that had the heading, "You Must Join by the 16th," and so that

12   would have been with Treasures and Centerfolds.  I asked for

13   information from their firm as to dates when -- if something was

14   mailed and returned for that information to see how long they

15   had it in their possession and the like.

16        THE COURT:  You know what?  I think we've got enough

17   of a basis to rule.  The question is whether they've shown good

18   cause.  We're not trying plaintiffs' counsel here.

19        There's no overarching evidence of inadequate pursuit

20   of the plaintiffs or other impropriety of that sort or failure

21   to vigorously seek out those who haven't timely filed, so I

22   am -- I don't think we need to require more.

23        MR. SOUTHERLAND:  Okay.  With respect to -- and I --

24        THE COURT:  Now that leaves us --

25        MR. SOUTHERLAND:  If I may, Your Honor --

1          THE COURT:  A few left over.  That leaves us --

2          MS. SOSA-MORRIS:  It leaves us with Tawanna Deshayes.

3  She was out of the country when the mailing was sent.  She

4  provided a declaration as to that fact, and as soon as she

5  received -- actually received the notification, she contacted us

6  and joined this case.

7          THE COURT:  When did she return from the country?

8          MR. SOUTHERLAND:  That's not identified in her

9  declaration.

10         THE COURT:  Find that out before and convey it to

11  opposing counsel.

12         MS. SOSA-MORRIS:  Okay.  And would you like for me to

13  conference with --

14         THE COURT:  Either that or have her file next time.

15  We'll deny it as to her and it'll be equitably tolled as to her,

16  whichever is most efficient.

17         MS. SOSA-MORRIS:  Okay.

18         THE COURT:  You have to let me know, all right?

19         MS. SOSA-MORRIS:  With one more who did not provide

20  her declaration, it's the -- Mariah Thrash.  She has been -- she

21  was incarcerated during the opt-in period; however, her mother

22  provided the form to her.  And it was signed prior to the

23  deadline but not received by us until after the opt-in deadline,

24  and we would like an exception for her due to her current

25  situation.

1          THE COURT:  When did she obtain the opt-in form?

2          MS. SOSA-MORRIS:  She received it and signed it on

3    the -- I believe it was January 15th, the day before.

4          THE COURT:  Pretty close to the deadline.

5          MR. SOUTHERLAND:  But there's been no proof provided

6    as to when she got it or when she got notice or anything,

7    Your Honor.  She's one of those categories --

8          THE COURT:  Well, apparently, she did receive it on

9    the date on which she signed it.  Did her family member then

10   mail it on her behalf?

11         MS. SOSA-MORRIS:  Yes, that's correct.

12         THE COURT:  And where is that information?  Because

13   you say presumably through a family member.

14         MS. SOSA-MORRIS:  It's --

15         THE COURT:  Not there?

16         MS. SOSA-MORRIS:  It's not here.  Right.

17         THE COURT:  All right.  Supplement the information as

18   to when she received it in the prison, when she arranged for it

19   to be sent to the lawyers, and when it got to the attorneys.

20   And then I will either -- if I find that sufficient, if you want

21   to do a supplemental motion for these people, fine, or you can

22   agree that it might be more efficient to have her file in the

23   next group, and I'll equitably toll for 30 days.

24         MS. SOSA-MORRIS:  Thank you, Your Honor.

25         THE COURT:  All right.  Ms. Gallegos I'm not going to

1   allow to be equitable -- equitably toll as to her.

2          MS. SOSA-MORRIS:  Okay.  We -- there's no objection to

3   her.

4          MR. SOUTHERLAND:  She's one who was --

5          THE COURT:  Oh, that's the one you've agreed to?

6          MS. SOSA-MORRIS:  Yes.

7          THE COURT:  All right.  Sorry.  I didn't mark that.

8   Sorry.  Okay.

9          MR. SOUTHERLAND:  With respect, if I may,

10   Your Honor --

11          THE COURT:  Is there anybody we haven't covered who is

12   not the subject of an agreement?

13          MS. SOSA-MORRIS:  No.  I believe we've covered

14   everybody, the late -- the people who filed --

15          THE COURT:  Good.

16          MR. SOUTHERLAND:  Well, what about Burke, Your Honor?

17   Ms. Burke signed on the 18th, and what she said in her

18   declaration was that she had moved, although she said she did

19   not check her mail regularly.

20          THE COURT:  Hold on.  Let me find Ms. Burke.

21          MS. SOSA-MORRIS:  Ms. Burke moved, and her --

22          THE COURT:  I've got her.

23          MS. SOSA-MORRIS:  The consent was forwarded to a P.O.

24   box --

25          THE COURT:  Yeah.  No, that's fine.  I'm going to

1    allow her late filing.

2             MS. SOSA-MORRIS:  Thank you.

3             MR. SOUTHERLAND:  With respect to Ms. Cazares,

4    Your Honor, you know, I -- one question I had was that looking

5    at the declaration compared to the consent form, the signatures

6    do not match up.

7             MS. SOSA-MORRIS:  The declaration -- the consent

8    form -- or, sorry, the declaration -- or either one might have

9    been signed through the RightSignature website, and one might

10   have been signed a physical signature.  So that might be the

11   discrepancy.

12            THE COURT:  Why don't you find out and, again, explain

13   it to defense counsel.

14            MS. SOSA-MORRIS:  Okay.

15            MR. SOUTHERLAND:  There was that one, and there was

16   one other, Your Honor, where the --

17            THE COURT:  That's a separate issue from late filing.

18   I will allow late filing assuming the signature issue can be

19   resolved.

20            MS. SOSA-MORRIS:  Would you like us to --

21            THE COURT:  I want you to agree on this kind of stuff,

22   really.

23            MS. SOSA-MORRIS:  I mean honestly, with regards to the

24   signatures, I have --

25            THE COURT:  Really.

1          MS. SOSA-MORRIS:  They signed it.  That's all I can

2    say.  I don't know why it's -- the cursive is different or if

3    it's print and now it's --

4          THE COURT:  See what you can find out.  Let's --

5          MR. SOUTHERLAND:  If there's confirmation they're the

6    same, but when they -- when they look like this, Your Honor,

7    there is reason.

8          THE COURT:  See what you can find out and hopefully

9    reach agreement.  If not, obviously, I'll decide.

10         MS. SOSA-MORRIS:  Thank you, Your Honor.

11         THE COURT:  All right.  I think that takes care of the

12   issue on late filing.  Any other motion related to those issues

13   are moot at this time.

14         MS. SOSA-MORRIS:  Thank you, Your Honor.

15         THE COURT:  All right.  Now let's deal with the

16   protective order, okay?

17         Let me begin -- well -- I do not think that this issue

18   was resolved for all time in the Court's prior hearing.

19   Obviously, things have changed.

20      *(Microphone falls and is replaced.)*

21         MR. ALLEN:  My apologies, Your Honor.

22         THE COURT:  I'm happy to take up the issue whether, at

23   this time, rep- -- a more limited written discovery than every

24   opt-in member of the class is appropriate or not, and then the

25   separate but related issue as to whether the contents of the

1    written discovery is overbroad or whether the objections to the

2    written discovery are overbroad.

3            Those two issues deserve attention, and I'm happy to

4    give it that attention, but it's not predetermined.  The motion

5    is not inappropriate on that basis.

6            I also, just as a sort of overall point, worry about

7    the tone that some of the briefing has assumed, a willingness to

8    accuse the other side of bullying, harassing.  You are making

9    allegations of ethical improprieties.  I would really have a

10   very firm basis for making those kinds of *ad hominem* attacks

11   because that is what they are.  That's enough said on that

12   point.

13           Okay.  Issue:  Is individualized written discovery

14   necessary and/or appropriate?

15           It's your motion.

16       MR. KENNEDY:  Thank you, Your Honor.  We start with

17   the premise that under a Fair Labor Standards Act case, which

18   has been certified as a collective action, that it proceeds

19   through discovery as a -- as a collective action for discovery

20   purposes.

21           Frankly, we could stack up ten cases, and the

22   defendant could stack up ten other cases where some courts allow

23   representative discovery and some don't allow it.  Of course,

24   it's the -- to the discretion of the court and the facts in the

25   particular case which is why, in our brief, we really focused on

1    the facts of our case and looked at other cases that were

2    similar to identify that this is appropriate for representative

3    discovery.

4           We've scoured the case law, and for cases where it is

5    appropriate, the typical sample is somewhere between 5 to

6    20 percent.  It's either there or they just say everyone has to

7    respond to discovery.

8           There is the -- probably the most-watched case in the

9    country right now that is involving misclassification of dancers

10    is in New York.  It's the *Hart versus Rick's* case where you've

11    got titan legal firms on both sides with good resources --

12           THE COURT:  And how many opt-in plaintiffs are

13    involved in that case?

14           MR. KENNEDY:  There are about 53.

15           The reason why it's a big case is because it's a

16    rule 23 class action.

17           THE COURT:  Right.

18           MR. KENNEDY:  It's a hybrid, so they're paying a lot

19    of attention to it.

20           THE COURT:  Well, they're paying attention to it not

21    because it's part of the jurisprudence of exotic dancers and

22    compensation to exotic dancers, but because of the rule 23

23    applications, I suspect.

24           MR. KENNEDY:  Well, most -- most of the cases filed

25    throughout the country are under the FLSA.

1          THE COURT:  That's my point.

2          MR. KENNEDY:  Right.

3          THE COURT:  And the whole issue of hybrid rule 23

4    class actions continues to be one that attracts great attention

5    as part of the rule 23 case law.

6          MR. KENNEDY:  Right.  For purposes of this hearing, in

7    that case, even though there, in my -- I have to say a small

8    number of opt-ins -- 53 people -- the court still found, based

9    on the case law, that it was burdensome, harassing and defeats

10   the whole purpose of having a collective FLSA and the

11   efficiencies that can be achieved by having all 53 of those

12   opt-ins respond to the same identical sets of discovery.

13         Instead, the court there -- and it's attached as

14   Exhibit D to our brief, Your Honor, or our filing -- let me make

15   sure it's D.

16         THE COURT:  I guess my question on the case law -- and

17   it's a little hard to tell from the cases both sides cited -- is

18   the extent to which there's a relationship between the type of

19   written discovery allowed to every plaintiff who opts in as

20   opposed to only a representative sample.

21         And here's my point:  If the defendants, contrary to

22   what they did do, had issued very simple boiled-down basic

23   interrogatories and document production requests, I might be a

24   whole lot and the case law might support better -- I might be

25   more willing and the case law might provide better support for

1    subjecting more opt-in plaintiffs to that kind of burden, which

2    would be lesser, than if -- if, as happened here, the

3    interrogatories and belated requests are quite detailed, go far

4    back in time, they're quite broad, and the burden imposed is

5    considerable.

6            So I suspect that in those cases -- and I would

7    certainly agree that in this case that kind of in-depth approach

8    counsels heavily in favor of a more limited group of opt-ins who

9    should be required to answer that kind of discovery.  So to what

10   extent is that sliding scale, if you will, appropriate?

11           MR. KENNEDY:  Well, to get to the meat of the

12   argument, we've looked at the discovery they've served, and I

13   scratched my head wondering why, having 30 of the current --

14   roughly 100 people have been served discovery -- after we get 30

15   sets of answers, why those answers will not cover the full range

16   of potential answers.  Many of these are, like, binary answers.

17   It's a yes/no.

18           Did you pay a tip?  You know, were you paid hourly?

19           THE COURT:  Some of them were --

20           MR. KENNEDY:  Some of them were broader.

21           THE COURT:  And that's not dealing with the separate

22   question of even as to just a few -- or more than a few but not

23   all of the opt-ins are the requests overly broad or burdensome.

24           MR. KENNEDY:  And I'm prepared to discuss --

25           THE COURT:  And that's a separate issue that we're

1    going to take up first after we deal with how many people have

2    to answer them --

3              MR. KENNEDY:  Our --

4              THE COURT:  -- and how are we going to pick those

5    people.

6              MR. KENNEDY:  -- 30 percent --

7              THE COURT:  And just so our -- I'm sorry.  I didn't

8    mean to interrupt.

9              MR. KENNEDY:  And I was making that offer instead of

10   trying to say, no, five, and then you do 50 and then we --

11             THE COURT:  That would be how many out of how many?

12             MR. KENNEDY:  That would be 30 out of 90 -- well, if

13   there's 95 right now, so it's maybe 33 people.

14             If this Court denies the defendants' motion for --

15   to -- for arbitration for the additional 85, there would be a

16   total of 180.  So that would add, you know, roughly another --

17             THE COURT:  Let's deal with the

18   no-arbitration-argument people first.

19             MR. KENNEDY:  Okay.

20             THE COURT:  And if we deny arbitration, you can apply

21   the same approach, again, assuming that there is a sufficiently

22   clear model in the approach we take today.

23             MR. KENNEDY:  Right.  So it would be roughly 32, 33

24   people, Your Honor.

25             THE COURT:  All right.

1          MR. KENNEDY:  And my proposal is those 30 answer.  We

2     provide all the answers.  The defendants can then have an

3     opportunity to review it, and if they for some reason believe

4     that there are enough variances there where they need to talk to

5     the other or propound additional discovery to the remaining 10,

6     another 20 or whatever, then by all means --

7          THE COURT:  Or if they turn out not to be

8     representative of the larger group.

9          MR. KENNEDY:  Exactly.  If for some reason we randomly

10    select someone who only worked two weeks, that's not going to be

11    helpful to either side.

12         THE COURT:  So tell me what specific deficiencies you

13    see in that, recognizing that it does provide an opportunity to

14    come back and ask for more if the group that initially provides

15    responses is not representative, that is, doesn't cover all of

16    the periods, provide all of the kinds of the information needed,

17    or if you have reason to believe that there is additional

18    information out there that you need and can explain why.

19         MR. ALLEN:  With respect to hours worked, Your Honor,

20    we already have reason to believe that the discovery responses

21    we're going to get will not match up with the defendants'

22    records for the time that the dancers worked.

23         THE COURT:  Why don't we wait and see if that's true?

24         MR. ALLEN:  Well, it's already been the case with

25    respect to declarations filed by a couple of the party

1    plaintiffs.

2         THE COURT:  Let's see what the verified answers to

3    interrogatories say when you are more precise about asking for

4    the information.

5         MR. ALLEN:  Um, do you think it would be appropriate,

6    Your Honor, to perhaps require discovery responses for the

7    outstanding requests?  Because those have already been served.

8         THE COURT:  How many do we have?

9         MR. ALLEN:  I believe it's 25 and 24.  Twenty-five

10   that have been objection only and 24 that have been very cursory

11   incomplete responses.

12        THE COURT:  But -- okay.  And so there are 50 people

13   so far --

14        MR. ALLEN:  Correct.

15        THE COURT:  -- instead of 30, basically?

16        MR. KENNEDY:  Correct.

17        MR. ALLEN:  And --

18        THE COURT:  That -- is there a problem with that as

19   kind of a -- since they've already been served and you've

20   already at least done some work on all of them?

21        MR. KENNEDY:  Your Honor, I'm here to make things move

22   along in the case, and if -- if that's what makes things work,

23   that's fine with me.

24        THE COURT:  I think it's workable, and it does achieve

25   a good part of the objective that you came in with with your

1     motion for protective order.

2             MR. KENNEDY:  Right.

3             THE COURT:  Not all of it, obviously, but that's not

4     the test.

5             MR. KENNEDY:  Right.

6             THE COURT:  I agree that this is the kind of case, of

7     a scale and nature that makes it appropriate for less than

8     100 percent coverage for written interrogatories and production

9     requests at the outset.

10            There may be a targeted need for follow-up additional

11    more generally applicable or more broadly applicable requests if

12    there are inadequacies demonstrated and what these turn out

13    after we rule on objections, overbreadth and -- on both requests

14    and objections.  But at the outset, if we stop now, that seems

15    to me to make sense.

16            MR. KENNEDY:  Your Honor, I have an additional

17    proposal, which I think will streamline the process with respect

18    to damages, and I've outlined this in our brief.  And it goes

19    like this:  I propose that we produce a rule 26 damage model,

20    which we're required to do anyway.

21            THE COURT:  Yes.

22            MR. KENNEDY:  The damage model will be based, in the

23    first instance, on the records that the defendant has in their

24    possession and they are producing to us.

25            THE COURT:  And that they produced, all right.

1          MR. KENNEDY:  These are records that show the log-in

2     times when they showed up for work.  It'll show the start and

3     stop times, the days they worked.  The second category would be

4     the house fees that the club charged for them to work there, and

5     the third category would be whenever a tip was collected from a

6     customer in the form of a credit card charge.  They took $5 out

7     of the tips, and the club kept that, and there's records of

8     that.

9          THE COURT:  And would your model -- would the

10    information that you provided the defendants, based on this

11    model, be an opt-in-plaintiff-by-opt-in-plaintiff calculation?

12         MR. KENNEDY:  Yes.

13         THE COURT:  All right.

14         MR. KENNEDY:  And here's the one caveat.  To the

15    extent any of these opt-in plaintiffs believe that the records

16    are inaccurate, I think that additional questions about why

17    there's a variance is appropriate.  And we'll be more than happy

18    to talk to those clients and say, "Why do you think their

19    records are not accurate," and provide an interrogatory or

20    survey answer, some form of explanation of why that -- their

21    damage records are not sufficient.

22         THE COURT:  If they are individuals who have not had

23    to answer written discovery requests asking that information.

24         MR. KENNEDY:  Correct.  I'm saying for everyone --

25         THE COURT:  All right.

```
1          MR. KENNEDY:  -- even if it's not in the initial half
2     group or 45 percent, whatever the number is.  We will do that
3     for everyone --
4          THE COURT:  All right.
5          MR. KENNEDY:  -- because I, frankly -- damages are --
6     can be individualized.
7          MR. WALLACE:  The problem with the approach,
8     Your Honor, is that we had -- we have dancers whose economic
9     model is going to be based on what they earned in that club in
10    part.  We do not know, for example, what they earned in the club
11    outside of what they earn off of a credit card transaction.  We
12    have records --
13         THE COURT:  Well, you know that what you are going to
14    be given is just -- is based only on your records, so whatever
15    your records show will be the basis of the information you get
16    back.  And if the plaintiffs believe that your records are
17    inaccurate, you'll still get that model, but you may also get a
18    declaration saying, "We think we're entitled to more, and here's
19    why."
20         MR. KENNEDY:  That's exactly our proposal.
21         THE COURT:  Why doesn't that cover the problem you
22    raise since it's based on your records?
23         MR. ALLEN:  It does at the initial stage, Your Honor.
24         THE COURT:  It seems to me that that makes sense.
25    Tell me another reason that you are concerned about it.
```

1          MR. WALLACE:  With respect to damages?

2          THE COURT:  I think that's what we're talking about.

3          MR. WALLACE:  Okay.  If we're only talking about

4   damages, I think that that would be an initial step to see --

5          THE COURT:  Let's see where we are.

6          MR. WALLACE:  -- what the damage model is.  But from

7   a -- in a wage and hour lawsuit, we believe that the -- that the

8   plaintiffs should have some obligation to tell us what are their

9   wage and hour damages --

10          THE COURT:  That's what they propose to do.

11          MR. WALLACE:  -- outside of -- outside of picking

12   through our records and trying to figure out from our records

13   what they think is accurate and that they think is not accurate.

14          For example, when we met with Mr. Kennedy, we said,

15   "Okay.  That seems like a reasonable conclusion if you are going

16   to concede that our records are accurate" --

17          THE COURT:  Well, no, no, no.  I think what he's done

18   is saying where we do concede that your records are accurate,

19   here's the number based on our model.  If you think there are

20   problems with the model, we can talk about that separately.  But

21   here, based on our concession that as to this plaintiff your

22   records are accurate consistent with what she remembers and how

23   long she remembers working on the days indicated in the records,

24   fine.

25          To the extent there is not that concession for an

1    individual opt-in plaintiff, this process proposes the

2    plaintiff's response identifying that, including a declaration

3    by the plaintiff explaining why that plaintiff believes your

4    records to be inadequate.  And at that point we will have a

5    basis to decide as to that group, its size and the kind of

6    reasons they identify, what additional discovery would be

7    appropriate.

8            Why doesn't that -- assuming you can't agree, which,

9    frankly, I'm assuming.

10           MR. WALLACE:  And assuming we can't agree, one of the

11   problems with the representative discovery as it relates to

12   damages is you're going to have a representative --

13   plaintiffs -- testifying about dancers and the amount of hours

14   they worked that they --

15           THE COURT:  But you will have a written record of

16   individual -- each individual opt-in's damage calculation.

17           MR. WALLACE:  Yes.

18           MR. ALLEN:  Can we ask that it might be verified?  I

19   think that might solve the concern.

20           THE COURT:  A declaration?

21           MR. KENNEDY:  By me as -- in a rule 26 disclosure?  It

22   just requires that we produce it as if I can get an expert to do

23   it or --

24           THE COURT:  Well, the model itself, obviously, that's

25   not what the plaintiffs are doing.  If they are going to submit

1   a declaration explaining why they do not accept the validity or

2   accuracy of your records, the defendants' records, it's a

3   declaration, and it has to comply with the rule requirements for

4   a declaration.

5           MR. KENNEDY:  By all means we will -- if there's any

6   variance, there's going to be 180 or whatever the number is.  If

7   10 of them say, "Those records aren't right.  I'm owed more,"

8   we'll get them to sign a declaration explaining why.

9           THE COURT:  And you've just described how every FLSA

10  collective action is tried.  You don't have every plaintiff

11  testify, every opt-in.

12          MR. WALLACE:  I -- I agree that at time of trial we

13  don't -- we would not insist that 181, if that's the number,

14  would come up to this witness stand and testify.

15          THE COURT:  Right.

16          MR. WALLACE:  But there would be representative

17  testimony about the case.

18          THE COURT:  Right.

19          MR. WALLACE:  But with respect to discovery,

20  Your Honor, respectfully, we would at least request for the

21  number of dancers that are going to remain in this lawsuit, pre-

22  or postarbitration decision, that not only do we get a damage

23  calculation model, we would like for those that are asserting,

24  "This is" -- "these are my damages, and here is how they're

25  calculated," for them to put that either in a declaration or in

1   a sworn answer to an interrogatory, which they normally would

2   have done.

3         THE COURT:  Okay.

4         MR. WALLACE:  Just that portion of it.

5         THE COURT:  Again, to the extent it's an expert

6   calculation, it doesn't make sense for them to do that, a model,

7   a number.

8         If they are going to dispute your records, they will

9   submit a declaration that complies with the rule explaining that

10  and explaining the number of hours they believe they worked and

11  should be compensated for differently than your records support.

12  But if it is an expert calculation based on your records assumed

13  to be valid and accurate, I'm not going to require that they

14  submit a verification -- a verified answer to an interrogatory

15  to the expert's model and the number it generates.

16        That does not seem to me to make sense.  You'll have a

17  chance at the appropriate point to depose the expert, no doubt,

18  and test the validity of the model.  That's different.  I think

19  we have responded to your concern.

20        MR. SOUTHERLAND:  Your Honor --

21        THE COURT:  Unless I'm missing something, and I just

22  don't think I am at this point.  We're not defining all the

23  discovery you're ever going to get here.

24        MR. WALLACE:  Oh, no, I understand that, Your Honor.

25        THE COURT:  Okay.

1          MR. WALLACE:  I understand that we're going to have a

2    right to come back and say --

3          THE COURT:  Well, if you need to.  You're going to

4    have a right, first, to attempt to agree after you see what the

5    variances are and the type of explanation provided.  But if you

6    can't agree, by all means you can come back, and we can talk

7    about additional discovery to explore those differences.  But,

8    frankly, I think this horse is dead and being beat --

9          MR. SOUTHERLAND:  Your Honor --

10          THE COURT:  -- at this point.

11          MR. SOUTHERLAND:  -- if I understand where we're

12    going -- and just to make sure -- conceptually what we're

13    planning on doing is the people who have already been sent

14    discovery, they're going to respond.  Secondly, if I understand,

15    in connection with the damage model, that will be proposed.  To

16    the extent there's a disagreement, they'll provide the bases for

17    their disagreement.

18          THE COURT:  For -- in the form of a declaration by the

19    plaintiff where the disagreement is, that opt-in plaintiff's

20    factual disagreement with the accuracy of your hourly records.

21          MR. SOUTHERLAND:  And that's for those who have not

22    received written -- I mean, obviously, those who do receive

23    written discovery will respond.

24          THE COURT:  That's for those who have received written

25    discovery.

1          MR. KENNEDY:  Your Honor, we're going to -- someone's

2     going to order this transcript.  We're going to go back and read

3     it and hear what you just said.  All 95 have received written

4     discovery.  I think we're narrowing it down --

5          THE COURT:  Okay.  To whom the responses have been

6     filed, whether they're in form of objections or otherwise.  But

7     I thought you had said, Mr. Kennedy, that for every opt-in

8     plaintiff you were going to provide this model.

9          MR. KENNEDY:  The damage model, absolutely.

10          THE COURT:  Then this applies to -- separately to

11     every opt-in plaintiff.

12          MR. KENNEDY:  Understood.

13          THE COURT:  It is different from the

14     interrogatory/production request approach we're --

15          MR. SOUTHERLAND:  That's what --

16          THE COURT:  -- taking in that respect.

17          MR. SOUTHERLAND:  -- I understood, Your Honor.

18          THE COURT:  All right.  So we've got two --

19          MR. SOUTHERLAND:  There's additional threshold --

20          THE COURT:  -- tracks going.

21          One at a time.  Sorry, Mr. Southerland.  I didn't mean

22     to interrupt you.

23          MR. SOUTHERLAND:  I'm sorry, Your Honor.

24          THE COURT:  Two tracks.  One is we're limiting the

25     initial responses to the discovery requests that have been

```
1    served to the 50-plus -- however many there are -- that you have

2    filed some response to whether it's objections only or

3    objections and some information.

4          The second is that when you submit your damages model,

5    you'll do it for every opt-in plaintiff with this declaration

6    for any variance based on rejecting the accuracy of the

7    defendants' numbers provided for those opt-ins who do dispute

8    it.

9          MR. KENNEDY:  Right.  Logically that presupposes they

10   give us the records to do the analysis.

11         THE COURT:  Absolutely.  And that you -- I don't know

12   if you proposed to have your expert report that explains the

13   model issued when you file these model -- these numbers and

14   declarations for those who dispute the accuracy of the

15   underlying records for them.  It would seem to make sense to

16   have the expert's report explaining the model issued before or

17   after.

18         MR. KENNEDY:  Understood.

19         THE COURT:  Or at the same time, not after.

20         MR. KENNEDY:  I understand, Your Honor.

21         For clarity on the -- we're going to talk about what

22   discovery they're going to respond to, but as far as who's been

23   served --

24         THE COURT:  "They" being your clients?

25         MR. KENNEDY:  Correct.
```

1          THE COURT:  Okay.

2          MR. KENNEDY:  In the defendants' response to our

3    motion for protective order, they identified 29 people -- 49

4    people that have been served with discovery.  I want to make

5    sure that's the universe of plaintiffs we're talking about.

6          MR. ALLEN:  Agreed.

7          THE COURT:  Not for the damages model.  That's

8    everybody?

9          MR. KENNEDY:  Correct.

10          THE COURT:  Okay.

11          MR. WALLACE:  The 49 people are going -- are required

12    to respond to the written discovery that has already been

13    served.

14          THE COURT:  After we talk about the extent to which

15    it's reasonable discovery and whether the objections are

16    reasonable.

17          MR. SOUTHERLAND:  One thing --

18          THE COURT:  That's a separate issue.  We have to have

19    that discussion.

20          MR. WALLACE:  No.  Correct, Your Honor.

21          THE COURT:  And I don't know if you guys have talked

22    about that issue among yourselves.

23          MR. WALLACE:  We have not.

24          THE COURT:  You violated the rules if you haven't done

25    that.  You have to confer.

1          MR. KENNEDY:  I -- I agree.  I won't -- won't do

2  *ad hominem* attacks right now.

3          THE COURT:  Really.  I mean, there's a lot there that

4  I think you should be able to agree on.  There's some that I

5  suspect you won't, and I'm happy to resolve it, but you should

6  talk about whether you can agree before you come into the court

7  with full-blown motions and briefs.

8          MR. KENNEDY:  I understand, Your Honor.

9          MR. WALLACE:  Agreed, Your Honor.

10          THE COURT:  Frankly, you're spending your client's

11  money unnecessarily.

12          MR. WALLACE:  I agree wholeheartedly, Your Honor, and

13  I think we can -- assume we can, on some of the interrogatories,

14  agree that they are relevant, that they're responsive, that we

15  should get rid of some of these objections and the like.

16          On the other hand, I know that there are going to be

17  some of the interrogatories that I have propounded that the

18  plaintiffs are going to initially object to.  And I get that,

19  and I'm not moving and have not moved and will not move to

20  compel answers at this time on that discovery.

21          THE COURT:  You know you're not allowed to until you

22  have a premotion dispute.  And even if you were going to have a

23  premotion dispute, you would still have to confer on those.

24          MR. WALLACE:  Yes, Your Honor.  I agree.  And --

25  and -- but those were really going to be my next words, that

1    we'll do this premotion conference --

2              THE COURT:  Okay.  Good.

3              MR. WALLACE:  -- and talk about it.

4              I do believe that there are going to be some issues

5    that we have loggerheads over and we're not going to agree on,

6    but I'm not --

7              THE COURT:  I certainly agree that you will.  I fully

8    expect that you will, but let's narrow it down and see what

9    those issues are and consider them in the context of the other

10   information you've agreed will be provided.

11             MR. WALLACE:  I -- I agree.

12             THE COURT:  So when does it make sense to hold that

13   discussion?  Because everything is being held up.

14             MR. KENNEDY:  I have a proposal right here, ones that

15   we're agreeing to and ones we need to discuss.  It's a

16   narrowed-down time wise --

17             THE COURT:  That's fabulous.  I would suggest that you

18   have these discussions.  You give that to the defense lawyers if

19   you haven't already -- I don't know if you have -- and that we

20   perhaps give you a chance to have these discussions.  And

21   sometime, say, Thursday of next week we come back, and you

22   have -- then you tell me what's agreed to, what isn't, and we

23   can have a much more --

24             MR. KENNEDY:  Would -- is the Court available on

25   Wednesday?  Because we will have some issues for sure,

1    Your Honor.

2              THE COURT:  I'm confident you will.  I'm absolutely

3    confident.  You -- you would disappoint and shock me if you did

4    not.  But let's look at the calendar and see what makes sense to

5    do it.

6              MR. KENNEDY:  I'm available all day on April Fool's

7    Day, no joke.

8              THE COURT:  I take it April 2nd is not a good day for

9    you.

10             MR. KENNEDY:  I am not, and sounds like Mr. Gibson --

11   Ben's not available.

12             MR. WALLACE:  I've got trial that day, Your Honor, in

13   county court.  I've asked for it to be continued, but I don't

14   know if it will be.

15             MR. KENNEDY:  So April 1st does work or --

16             MR. ALLEN:  April 1st works for me.

17             MR. WALLACE:  I've got a two-day trial in county court

18   on an eminent domain.

19             THE COURT:  Starting when?

20             MR. WALLACE:  On April 1st.

21             THE COURT:  All right.  So, no, April 1st apparently

22   doesn't.  What about --

23             MR. KENNEDY:  I don't want to impose.  I mean, unless

24   one of the other four lawyers that represent the company can

25   speak --

1              MS. SERPER:  I've got conflict on the 1st, but not the

2    2nd.

3              THE COURT:  And you have a conflict, Mr. Kennedy, on

4    the 2nd?

5              MR. KENNEDY:  I do.

6              THE COURT:  All right.

7              MR. KENNEDY:  I'm available the following Monday.

8              MS. SERPER:  Is that the 7th?

9              THE CASE MANAGER:  The 6th.

10             THE COURT:  I can't do the 6th, sorry.  Well, no,

11   cannot do Tuesday or Wednesday.  What about -- what about

12   Thursday the 9th?

13             MR. WALLACE:  I'm open.

14             MR. KENNEDY:  I'm free, too, Your Honor.

15             THE COURT:  Thursday the 9th.

16             MS. SERPER:  That'll work.

17             THE COURT:  Why don't we say -- you may have to wait a

18   few minutes, but -- because I have other hearings starting at

19   2:00, but let's say 3:00 o'clock.  Why don't we say 3:30 so you

20   will be less likely to have to wait longer.

21             MR. KENNEDY:  Yes, Your Honor.

22             THE COURT:  All right.

23             MR. WALLACE:  One other issue, if I can bring up?

24             THE COURT:  Sure.

25             MR. WALLACE:  I -- I appreciate the fact that we're

1   going to get -- we're going to meet and we're going to confer

2   and we're going to try to figure out which questions should be

3   asked and which ones ought to be taken back.

4           We've got 25 and 24 or 49 girls that they're going to

5   answer --

6           THE COURT:  They're not "girls."

7           MR. WALLACE:  I apologize, Your Honor.  I -- I

8   apologize.

9           THE COURT:  Foot in mouth.

10          MR. WALLACE:  Right.  It was, clearly.

11          THE COURT:  Yes.

12          MR. WALLACE:  We have 49 plaintiffs --

13          THE COURT:  Thank you.

14          MR. WALLACE:  -- who are going to answer discovery.

15   Those 49 are all plaintiffs who worked at either Cover Girls or

16   Gold Cup.  We do not have a single answer from a single person

17   pertaining to their work at Treasures or Centerfolds.

18          THE COURT:  All right.  Did some of them also work at

19   the other clubs?

20          MR. SOUTHERLAND:  What we can do, Your Honor, I think

21   is check to see if they opted in because those, to the extent

22   they filed notices of consent that were timely, they may be

23   covered, but some may not.

24          THE COURT:  All right.

25          MR. SOUTHERLAND:  What we might want to do as part of

1   this time when we get back together in two weeks, figure out

2   that number, and then have a discussion as to representative

3   sampling as to them.

4           THE COURT:  Well, in that case, what I would suggest

5   is that for some of the 49 -- however many there are -- for whom

6   objections only were filed, if they are only for one of the

7   clubs and not the other two, do not require for the responses as

8   to them and instead randomly pick an equivalent number of other

9   opt-ins who did work at the other clubs.

10          MR. KENNEDY:  That is a little confusing, Your Honor.

11  If I can make a suggestion, right now we're working with a

12  universe of 49 out of 95 --

13          THE COURT:  Yes, sir.

14          MR. KENNEDY:  -- which is substantially more than what

15  I think the case law calls for, but I'm trying to move the case

16  along.

17          THE COURT:  Well, in my discretion I think it's a

18  reasonable amount.

19          MR. KENNEDY:  I understand.

20          What I would propose is the parties get together and

21  select 49 of the 95 so that we get people that worked at all the

22  clubs.

23          THE COURT:  I don't have a problem with that.  I don't

24  have a problem with that.  If you -- and I think it's a

25  variation of what I proposed.

```
 1              But however you pick 49, I think that it makes sense
 2      as the right number as long as you take whatever steps are
 3      appropriate to ensure that the information you get will be
 4      representative of the issues in the case.  So what you propose
 5      seems to address that goal.
 6              MR. KENNEDY:  Okay.
 7              THE COURT:  It's a variation on what I proposed, which
 8      is aimed at addressing this angle.
 9              MR. KENNEDY:  Okay.  Well, then we'll get together and
10      identify 49 that equally works at all clubs or in some way that
11      we agree is representative of all the clubs.
12              THE COURT:  All right.  What else makes sense for
13      today?
14              MR. KENNEDY:  One other issue.  We have heard that
15      Mr. Davari, who I think is -- it's Mr. Duvari?
16              MR. DAVARI:  Yes, sir.
17              MR. KENNEDY:  -- is selling one or more of the clubs.
18      That raises issues about successor liability, and we requested
19      whether that's true or not from Mr. Wallace, and we had radio
20      silence the last three weeks.  So I just need an answer to that
21      because I'd rather -- if there are other parties that need to be
22      brought in, we need to do it sooner rather than later.
23              MR. WALLACE:  I was radio silent, Your Honor, because
24      I don't -- and I'm not trying to be snide.  I don't normally
25      discuss my clients' business as to what they're buying or
```

1    selling --

2           THE COURT:  Well, but this does bear on the weight in

3    which litigation will proceed.

4           MR. WALLACE:  My understanding, after talking with my

5    clients about this issue, is that none of the clubs that are

6    part of this lawsuit are for sale, have been offered for sale or

7    have received an offer for purchase.  I'm not sure where the

8    plaintiffs are coming up with their -- what they've heard, but

9    the clubs aren't for sale.

10          MR. KENNEDY:  That's good enough for me, Your Honor.

11   That's all I needed to know.

12          THE COURT:  That's helpful.  Thank you.

13          Okay.  So that, I think --

14          MR. SOUTHERLAND:  If I may make one suggestion,

15   Your Honor?  With respect to those late filers, when we come

16   back in two weeks, let's just cover that, too.

17          THE COURT:  I agree.  I agree.  So -- and, again,

18   after you've had a chance to deal with them.

19          So in terms of the motions that are outstanding, I

20   believe that the motion to permit late filing or the motion

21   to -- the motion to permit the late filing is -- let me see how

22   that was framed.

23          The motion to strike the late-filed consent forms is

24   denied in part and granted in part.  That's docket entry

25   No. 135.  The motion for the -- and the motions to supplement

1    are granted.

2              MR. KENNEDY:  Understood.

3              THE COURT:  Because they're part and parcel in

4    considering the claims.  So that would be 138, 140 -- I'm sorry.

5    One -- to the extent it's a motion, 145, and 146.

6              The motion for protective order is granted in part --

7    I think I -- it says in the docket sheet that 146 is a -- yes,

8    it's a motion to dismiss.  I'm sorry.  Forget 146.  You're

9    right.  It's the arbitration issue.  You're exactly right.  It's

10   149.

11             Docket entry 150, the plaintiffs' motion for

12   protective order, is granted in part.  And the motions to seal,

13   which is docket entry No. 151 and -- I thought there was another

14   one.  Perhaps that's the only one.  Docket entry 151 is granted.

15             MR. SOUTHERLAND:  I think, Your Honor, docket No. 152

16   may have been a second -- second supplemental motion to strike.

17             THE COURT:  No, it's a letter of agreement on

18   extending the deadline.

19             MR. SOUTHERLAND:  There were two supplemental motions

20   to strike, and I think the second one dealt specifically with

21   Ms. Murphy --

22             THE COURT:  Okay.

23             MR. SOUTHERLAND:  -- who's the one that they're going

24   to, I think, gather some additional information on.

25             THE COURT:  All right.  So that one has not yet been

1    resolved.

2            All right.  Anything else we need to do today?

3            MR. WALLACE:  One administrative question is all.

4            THE COURT:  Yes, sir.

5            MR. WALLACE:  We have our -- our motion and

6    supplemental motions regarding arbitration.  Some of the

7    plaintiffs that you have admitted today, the late filers -- I

8    believe roughly half, but I'm not positive -- are subject to an

9    arbitration clause.  I can supplement the motion or --

10           THE COURT:  If the Court rules --

11           MR. WALLACE:  -- just wait.

12           THE COURT:  Yeah.  I think you can wait because I

13   suspect the parties will either stipulate or agree.

14           MR. WALLACE:  Just wanted clarification, the Court's

15   preference.

16           THE COURT:  Yeah.  I think you can wait.  I don't

17   think we need to add to the motions thicket by filing things

18   that are going to follow as a matter of course depending on how

19   the Court resolves what's already on file.

20           MR. WALLACE:  Thank you, Your Honor.

21           THE COURT:  Does that make sense?

22           MR. WALLACE:  Yes, Your Honor.

23           THE COURT:  All right.  Anything else for today?

24           MR. WALLACE:  I don't believe so.

25           MR. KENNEDY:  I think that's it.

1          THE COURT:  See you in two weeks.

2          MR. KENNEDY:  Thank you, Your Honor.

3          MR. WALLACE:  Thank you, Your Honor.

4          MR. ALLEN:  Thank you, Your Honor.

5      *(Proceedings concluded at 4:50 p.m.)*

6                      -o0o-

7          I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above matter.

9

10   Date:  May 4, 2015

11                              /s/ Heather Alcaraz
                                Heather Alcaraz, RMR, FCRR
12                              Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25